## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| _____ : | | |
| UNITED STATES OF AMERICA | : | Hon. John Michael Vazquez |
| v. | : | Crim. No. 92-172-01 |
| FABIO PAZ | : | |
| _____ : | | |

---

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
## TO REDUCE SENTENCE PURSUANT TO
## 18 U.S.C. § 3582(c)(1)(A)

---

CRAIG CARPENITO
United States Attorney
970 Broad Street, Room 700
Newark, New Jersey 07102
(973) 645-2742

On the Brief:

Sarah A. Sulkowski
Assistant United States Attorney

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES..................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

I.      BACKGROUND ............................................................................................ 2

II.     LEGAL FRAMEWORK ............................................................................... 3

III.    ARGUMENT .................................................................................................. 6

        A.      The § 3553(a) Factors Strongly Weigh Against Paz's Release ......... 6

        B.      BOP's Pandemic Response Minimizes Paz's COVID-19 Risk .......... 8

                1.      BOP's COVID-19 Protocols .................................................... 8

                2.      BOP's Home Confinement Initiatives ................................. 11

                3.      COVID-19's Impacts on BOP Facilities ............................. 12

                4.      Relative Risks Inside and Outside CI Rivers ...................... 13

        C.      This Court Lacks Authority to Direct the BOP to Place the
                Defendant in Home Confinement................................................ 15

IV.     CONCLUSION ........................................................................................... 17

## TABLE OF AUTHORITIES

**CASES**                                                                            **PAGE(S)**

*Cisneros v. Collier,*
    No. 6:19cv112, 2020 WL 1861673 (E.D. Tex. Mar. 2, 2020) ........................ 15

*McKune v. Lile,*
    536 U.S. 24 (2002) ...................................................................... 16

*Meachum v. Fano,*
    427 U.S. 215 (1976) .................................................................... 16

*Moore v. United States Att'y Gen.,*
    473 F.2d 1375 (5th Cir. 1973) ...................................................... 16

*Pacifico v. Colvin,*
    No. 1:14-CV-1280, 2015 WL 5695271 (M.D. Pa. Sept. 28, 2015) ................ 15

*Sandin v. Conner,*
    515 U.S. 472 (1995) .................................................................... 16

*United States v. Epstein,*
    No. CR 14-287 (FLW), 2020 WL 1808616 (D.N.J. Apr. 9, 2020) .................... 4

*United States v. Garcia,*
    606 F.3d 209 (5th Cir. 2010) ........................................................ 16

*United States v. Gotti,*
    433 F.3d 613 (S.D.N.Y. 2020) ........................................................ 6

*United States v. Green,*
    764 F.3d 1352 (11th Cir. 2014) ...................................................... 5

*United States v. Jones,*
    836 F.3d 896 (8th Cir. 2016) ........................................................ 5

*United States v. Raia,*
    954 F.3d 594 (3d Cir. 2020) .......................................................... 4

*United States v. Voda,*
    994 F.2d 149 (5th Cir. 1993) ........................................................ 16

*United States v. Willis,*
    382 F. Supp. 3d 1185 (D.N.M. 2019) ................................................ 6

**Statutes**

18 U.S.C. § 3142(g) ................................................................. 5

18 U.S.C. §3553(a) ........................................................... *passim*

18 U.S.C. § 3553(a)(1) .......................................................... 6, 8

18 U.S.C. § 3553(a)(2)(B) .......................................................... 8

18 U.S.C. § 3553(a)(6) .............................................................. 8

18 U.S.C. § 3582 ................................................................. 16

18 U.S.C. § 3582(c) .................................................... 5, 6, 16, 17

18 U.S.C. § 3582(c)(1)(A) .................................................. 1, 3, 4, 6

18 U.S.C. § 3582(c)(1)(A)(i) ....................................................... 5

18 U.S.C. § 3582(c)(1)(A)(ii) ...................................................... 5

18 U.S.C. § 3621 ................................................................. 12

18 U.S.C. § 3621(b) .............................................................. 16

18 U.S.C. § 3624(c)(2) ........................................................... 11

34 U.S.C. § 60541(g) ............................................................. 11

**Pubic Laws**

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136
    134 Stat. 281 (2020) ......................................................... 12

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018) ................. 5

**Sentencing Guidelines**

U.S.S.G. § 1B1.13 .............................................................. 5, 6

**Other Authorities**

American Diabetes Association, "Understanding A1C" ................................ 14

Centers for Disease Control and Prevention, "Cocaine" ............................. 7

Centers for Disease Control and Prevention, "Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness" ........................ 1

Centers for Disease Control and Prevention National Center for Health Statistics, "Provisional Drug Overdose Death Counts" ..................................... 7

Federal Bureau of Prisons, "BOP Implementing Modified Operations" .. 9, 10, 11

Federal Bureau of Prisons, "COVID-19 Action Plan: Phase Seven" .................. 9

Federal Bureau of Prisons, "COVID-19 Home Confinement Information" ........ 12

Federal Bureau of Prisons, "Coronavirus Disease 2019 (COVID-19) Staff Screening Tool" ........................................................................................... 10

Federal Bureau of Prisons, "Frequently Asked Questions regarding potential inmate home confinement in response to the COVID-19 pandemic" .............. 15

Federal Bureau of Prisons, "Private Facilities" ............................................... 12

Federal Bureau of Prisons, "Visitor/Volunteer/Contractor COVID-19 Screening Tool" ........................................................................................................... 10

Federal Bureau of Prisons Health Services Division, "Pandemic Influenza Plan-Module 1: Surveillance and Infection Control" (Oct. 2012) .............................. 8

Peter M. Marzuk, MD, Kenneth Tardiff, MD, MPH; Andrew C. Leon, PhD; *et al.*, "Ambient Temperature and Mortality from Unintentional Cocaine Overdose," Journal of the American Medical Association (June 10, 1998) ........................ 7

National Institute of Justice, "Cocaine and Federal Sentencing Policy" (July 1995) ........................................................................................................... 7

New Jersey Dep't of Health, "New Jersey COVID-19 Dashboard" ................... 14

North Carolina Dep't of Health & Human Servs., "NCDHHS' COVID-19 Response" ..................................................................................................... 13

iv

**PRELIMINARY STATEMENT**

Defendant Fabio Paz ("Paz") is serving a 35-year sentence for drug trafficking and presently is housed at the Rivers federal correction facility ("CI Rivers") in Winston, North Carolina. He petitioned the Bureau of Prisons ("BOP") for compassionate release in April 2020, citing underlying health issues that he contends put him at high risk if he were to contract COVID-19. After BOP denied Paz's petition in early May 2020, Paz moved this Court for immediate release to home confinement, under 18 U.S.C. § 3582(c)(1)(A), based on the same health conditions as well as general complaints about the spread of COVID-19 in prison settings. Dkt. No. 28 (the "Motion" or "Mot.").[1]

The United States opposes the Motion, and this Court should deny it. Although the Department of Justice deems Paz's Type 2 diabetes diagnosis to constitute an "extraordinary and compelling" circumstance in the context of the COVID-19 pandemic, that does not end the inquiry.[2] The Court also must consider whether Paz poses a danger to the community and all other pertinent

---

[1] Paz previously moved for compassionate release, Dkt. No. 23, but withdrew that motion pending exhaustion of his administrative remedies, Dkt. No. 26.

[2] The Centers for Disease Control and Prevention ("CDC") considers Type 2 diabetes a heightened risk factor for severe illness if an individual were to contract the COVID-19 virus. *See* CDC, "Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness," *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (accessed June 21, 2020). Accordingly, it is unnecessary to examine Paz's claim of heart disease, *see* Mot. at 4, because it would, at most, constitute additional support (of which none is needed) for Paz's claim of an "extraordinary and compelling circumstance."

factors under 18 U.S.C. §3553(a), along with BOP's efforts to maintain the safety of inmates, the totality of which counsel against a grant of relief in this case.

The 3553(a) factors militate strongly against Paz's early release. His crime was no ordinary drug offense: as described in more detail below, he was the leader of a nationwide network that partnered with Colombian cartels to distribute thousands of kilograms of cocaine across the United States within the span of less than two years. And he continues to pose a danger to the community: the BOP places him in "a public-safety classification of greatest severity" and considers him an escape risk. Paz does not even attempt to address these public-safety implications of his request, much less offer any grounds on which the Court might find that his safety outweighs that of the public.

Moreover, the record makes clear that Paz's chronic health conditions are being effectively treated at CI Rivers, and BOP has taken extensive and effective steps to address COVID-19, including at CI Rivers. Indeed, the available evidence suggests that Paz is likely at *lower* risk of contracting COVID-19 there than he would be if released.

For all of these reasons, Paz's motion should be denied.

## I.    BACKGROUND

Paz was the mastermind of a nationwide transportation network that distributed, at the very least, more than 2,000 kilograms of cocaine from Colombian cartels throughout the United States in less than two years, from in or about July 1990 to in or about May 1992. Those shipments included 856

kilograms seized by law enforcement while en route to New Jersey, 613 kilograms seized in New Jersey, and 1,279 kilograms seized in or while en route to New York. Notably, those were only the quantities that law enforcement could *interdict*; testimony at Paz's trial indicated that Paz actually handled more than 7,700 kilograms of cocaine during the same 22-month period.

A jury convicted Paz on October 13, 1993 on one count of conspiracy to distribute more than 1,500 kilograms of cocaine and two counts of possession with intent to distribute 330 kilograms and 149 kilograms of cocaine, respectively. On May 23, 1994, the Honorable William G. Bassler, U.S.D.J., sentenced Paz to a term of life in prison, which Judge Bassler subsequently reduced to 419 months' imprisonment under a November 1995 amendment to the United States Sentencing Guidelines (the "Guidelines"). Both sentences were within the advisory Guidelines range of 360 months to life, as calculated by Probation. Paz's projected release date is February 14, 2022.

## II.   LEGAL FRAMEWORK

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in limited circumstances, grant a defendant's motion to reduce his term of imprisonment. Before a defendant may file such a motion, however, he must first ask BOP to file it on his behalf. 18 U.S.C. § 3582(c)(1)(A). A court may grant a defendant's own motion for a sentence reduction only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed

"from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

Paz made the requisite request to BOP, which denied that request on May 5, 2020, stating that, although Paz "do[es] meet some CDC vulnerable guidelines, Elderly (68) and Diabetic," he is "at no greater risk inside the controlled Correctional setting vers[u]s any community setting in any transmission state at this time, where [he] could freely move about place to place." Mot., Ex. A. BOP also pointed out that:

> According to [Paz's] medical record, [he] arrived at Rivers Correctional Facility . . . on May 5, 2018, with Diabetes, Hypertension, GERD, Glaucoma, Anemia, Hyperlipidemia and a history of Prostate Cancer. The providers have followed [Paz] closely in chronic clinic since [his] arrival and prescribed needed medications along the way.

*Id.* The government thus agrees with Paz that he has satisfied the statutory exhaustion requirement. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (explaining what a prisoner must do to satisfy this requirement).

Once a prisoner has satisfied § 3582(c)(1)(A)'s exhaustion requirement, a court may reduce his term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" only if the court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction," *and* (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). As the movant, Paz bears the burden of establishing his eligibility and worthiness for a sentence reduction. *See United States v. Epstein*, No. CR 14-287 (FLW), 2020 WL 1808616, at *2

(D.N.J. Apr. 9, 2020) ("Simply put, under the FSA, a defendant seeking a reduction in his term of imprisonment bears the burden of establishing both that he has satisfied 1) the procedural prerequisites for judicial review, and 2) that compelling and extraordinary reasons exist to justify compassionate release."); *accord United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The "applicable policy statements" of the Sentencing Commission include U.S.S.G. § 1B1.13. Under § 1B1.13, a court may grant a § 3582(c)(1)(A)(i) sentence reduction, after considering the § 3553(a) factors, if the court finds that (i) "extraordinary and compelling reasons warrant the reduction"; (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; *and* (iii) "the reduction is consistent with this policy statement." U.S.S.G § 1B1.13.[3] As one district court recently put it:

> It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is *not* thereby automatically entitled to a sentence modification. He is simply *eligible* for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(A) factors override, in any

---

[3] The policy statement refers only to motions filed by the BOP Director, because it was last amended on November 1, 2018, before the enactment of the First Step Act on December 21, 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by the BOP, the policy statement should be read to apply equally to both.

particular case, what would otherwise be extraordinary and
compelling circumstances.

*United States v. Gotti*, 433 F.3d 613, 615 (S.D.N.Y. 2020) (emphases added). In
sum, the stringent requirements of § 3582(c) make compassionate release a
"rare" and "extraordinary" event. *United States v. Willis*, 382 F. Supp. 3d 1185,
1188 (D.N.M. 2019) (quotation marks omitted).

## III.   ARGUMENT

### A.   The § 3553(a) Factors Strongly Weigh Against Paz's Release

Paz bears the burden of demonstrating that he merits release under the
§ 3553(a) factors, which both the compassionate-release statute and the policy
statement oblige this Court to consider "to the extent that they are applicable."
18 U.S.C. § 3582(c)(1)(A); *see also* U.S.S.G. § 1B1.13. Paz does not even
acknowledge this requirement, however, much less address any of the § 3553(a)
factors. No wonder: the relevant § 3553(a) factors strongly disfavor a sentence
reduction.

First, the "nature and circumstances of the offense," 18 U.S.C.
§ 3553(a)(1), involved Paz's leadership of a nationwide criminal network that
imported thousands of kilograms of cocaine into the United States, much of it to
or through New Jersey, in partnership with the notoriously vicious Colombian
cartels. The devastating impact of both crack and powder cocaine on the citizens
of the United States, and New Jersey in particular, is undeniable. In the early
1990s, when Paz committed his crimes, the crack epidemic was at or near its
peak in cities throughout New Jersey and across the United States.  By 1992,

the year Paz was arrested, cocaine accounted for nearly 120,000 emergency-room visits across the United States—more than 27 percent of *all* emergency-room visits that year. Nat'l Inst. of Justice, "Cocaine and Federal Sentencing Policy," at 41 (July 1995), *available at* https://www.ncjrs.gov/pdffiles1/ Digitization/155324NCJRS.pdf (accessed June 22, 2020). Between 1990 and 1992, while Paz was committing his crimes, there were 1,382 cocaine-overdose deaths in the United States. Peter M. Marzuk, MD, *et al.*, "Ambient Temperature and Mortality from Unintentional Cocaine Overdose," *Journal of the American Medical Association* (June 10, 1998), *available at* https://jamanetwork.com/ journals/jama/fullarticle/187625 (accessed June 22, 2020).

Even today, according to the CDC, cocaine accounts for nearly 20% of drug-overdose deaths in the United States. CDC, "Cocaine," *available at* https://www.cdc.gov/drugoverdose/ data/otherdrugs.html (accessed June 21, 2020). In the 12 months ending November 2019, there were approximately 850 cocaine-overdose deaths in New Jersey alone—more than 5 percent of the approximately 15,500 such deaths in the United States as a whole during the same period. CDC National Center for Health Statistics, "Provisional Drug Overdose Death Counts," *available at* https://www.cdc.gov/nchs/nvss/vsrr/ drug-overdose-data.htm (accessed June 21, 2020).

Thus, in a very real sense, Paz directly profited from a decades-long and still-ongoing epidemic of suffering and death occurring throughout this District and beyond—hardly a "nonviolent" crime. To send him home early would convey

the wrong message to his numerous victims, not to mention those who might seek to follow in his footsteps. 18 U.S.C. § 3553(a)(2)(B).

Compassionate release would also be inappropriate given Paz's "history and characteristics." 18 U.S.C. § 3553(a)(1). Paz is currently classified by CI Rivers at the highest offense-severity level and is considered an escape risk. And early release would result in the disparate treatment of similar traffickers—those who, like Paz, have not completed their sentences or been prioritized by BOP for home confinement. 18 U.S.C. § 3553(a)(6).

Accordingly, in light of Paz's record and the totality of the relevant § 3553(a) circumstances, this Court should deny his motion for a sentence reduction.

**B.    BOP's Pandemic Response Minimizes Paz's COVID-19 Risk**

**1.    BOP's COVID-19 Protocols**

BOP has had a Pandemic Influenza Plan in place since 2012.[4] That detailed protocol establishes a multi-phase framework that requires BOP facilities to begin preparations upon learning of a suspected outbreak overseas, and addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. Consistent with that plan, BOP began planning for potential coronavirus transmissions in January 2020. It established a working group to develop policies in consultation with subject

---

[4]   BOP Health Services Division, "Pandemic Influenza Plan-Module 1: Surveillance and Infection Control" (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.

matter experts at the Centers for Disease Control and Prevention, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, BOP has repeatedly revised the Action Plan to address the crisis.

On May 18, 2020, BOP began implementing Phase Seven of the Action Plan, which currently governs operations. BOP, "COVID-19 Action Plan: Phase Seven," *available at* https://www.bop.gov/resources/news/20200520_covid-19 _phase_seven.jsp#:~:text=(BOP)%20%2D%20On%20Monday%2C,the%20sprea d%20of%20the%20virus (accessed June 17, 2020). Only limited group gathering is permitted, to facilitate commissary, laundry, showers, telephone, and computer access, with attention to social distancing to the extent possible. *See* BOP, "BOP Implementing Modified Operations," *available at* https://www.bop.gov/coronavirus/covid19_status.jsp (accessed June 17, 2020) ("Modified Operations"). Further, BOP has severely limited the movement of inmates and detainees among its facilities, with exceptions for medical treatment and similar exigencies. *Id.* All official staff travel has been cancelled, as has most staff training. *Id.* All staff and inmates have been issued face masks and are strongly encouraged to wear appropriate face coverings when social distancing cannot be achieved. *Id.*

Every newly admitted BOP inmate is screened for COVID-19 exposure risk factors and symptoms. *Id.* Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. *Id.* Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. *Id.* In addition, enhanced staff screening is in place at all BOP facilities, *id.*, and staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from any BOP facility on that basis alone. BOP, "Coronavirus Disease 2019 (COVID-19) Staff Screening Tool," *available at* https://www.bop.gov/coronavirus/docs/covid19_staff_screening_tool_v2.8_20 200327.pdf (accessed June 17, 2020). A staff member with a stuffy or runny nose can be placed on leave by a medical officer. *Id.*

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. *See* Modified Operations, *supra*. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. *Id.* Any contractor or volunteer who requires access will be screened for symptoms and risk factors. *Id.*; *see also* BOP, "Visitor/Volunteer/Contractor COVID-19 Screening Tool," *available at* https://www.bop.gov/coronavirus/docs/Visitor_Volunteer_Contractor_COVID- 19%20Screening_v1_March_2020.pdf (accessed June 17, 2020).

10

Social and legal visits were stopped as of March 13 to limit the number of people entering each facility and interacting with inmates. *See* Modified Operations, *supra*. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. *Id.* Tours of facilities are also suspended. *Id.* Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. *Id.*

### 2.    BOP's Home Confinement Initiatives

In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the BOP Director, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10 percent of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if

11

the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion. As of June 21, 2020, BOP has transferred 4,413 inmates to home confinement. *See* BOP, "COVID-19 Home Confinement Information," *available at* https://www.bop.gov/coronavirus/ (accessed June 22, 2020).

### 3.    COVID-19's Impacts on BOP Facilities

Taken together, all of these measures are designed to sharply mitigate the risks of COVID-19 transmission in each BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates, while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. As of June 21, 2020, however, CI Rivers has *no* inmates currently diagnosed with COVID-19, *no* COVID-related deaths, and 20 inmates who have fully recovered from the virus. *See* BOP, "Private Facilities," *available at* https://www.bop.gov/coronavirus/ (accessed June 22, 2020).

Further, in managing the ongoing risk of additional cases, BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the

12

public, provide effective deterrence, and effectuate the other penological considerations set forth in 18 U.S.C. § 3553(a). It must consider the effect of a mass release of inmates on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess individual release plans, which are essential to ensure that each defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time when interstate transportation services often used by released inmates are providing reduced service) and the supervision of inmates once released (at a time when the Probation Office has necessarily cut back on home visits and supervision).

### 4.    Relative Risks Inside and Outside CI Rivers

Although the Government is sympathetic to Paz's concerns about his confinement during a pandemic, it is far from clear that his proposal for release to home confinement is even advisable as a matter of COVID-19 safety. As of June 17, 2020, Hertford County, North Carolina—where CI Rivers is located—had 46,855 laboratory-confirmed cases of the virus and 1,168 COVID-19 deaths. North Carolina Dep't of Health & Human Servs., "NCDHHS' COVID-19 Response," *available at* https://covid19.ncdhhs.gov/ (accessed June 17, 2020). And Paz's pre-incarceration state of residence, New Jersey, has been at the epicenter of the pandemic in the United States, with 167,703 confirmed cases

13

and at least 12,769 deaths from COVID-19 as of June 17, 2020. New Jersey Dep't of Health, "New Jersey COVID-19 Dashboard," *available at* https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml (accessed June 17, 2020). In comparison, CI Rivers—with 20 recovered cases, zero current cases, and zero deaths—may in fact be the safest place for Paz.

In addition, though the Government concedes that Paz's diabetes satisfies the "extraordinary and compelling" statutory prong given the ongoing pandemic, the Court should also consider Paz's current health status in determining whether compassionate release would in fact reduce his risk of serious illness or death.

The Government has obtained Paz's medical records from BOP, which indicate that BOP is effectively managing Paz's care and that he is not suffering acute or debilitating effects from his diabetes or any of his other conditions.[5] *See generally* Exs. A-B. To the contrary, the records show that Paz has been under consistent treatment for his diabetes mellitus since in or about 2011, with no apparent complications. Ex. A at 3-4. In fact, as of May 22, 2020, Paz's examining physician at CI Rivers recorded his A1C level as 6.7%, with the notation "controlled." Ex. B at 7; *see also* American Diabetes Association, "Understanding A1C," *available at* https://www.diabetes. org/a1c (accessed June 17, 2020) ("The goal for most adults with diabetes is an A1C that is less

_____

[5] Based on privacy concerns, the Government will not file Defendant's medical records on the public docket but will provide them to the Court under separate cover.

than 7%."). Similarly, Paz's medical records indicate that BOP has been monitoring his "benign essential hypertension" at least quarterly since 2012, with no acute incidents or hospitalizations. Ex. B at 6-7. Indeed, as of May 22, 2020, his examining physician at CI Rivers made the notation "RRR" with regard to Paz's heart, which is medical shorthand for "regular rate and rhythm." *Id.* at 7; *see also Cisneros v. Collier*, No. 6:19cv112, 2020 WL 1861673, at *4 (E.D. Tex. Mar. 2, 2020) ("RRR" stands for "regular rate and rhythm"); *Pacifico v. Colvin*, No. 1:14-CV-1280, 2015 WL 5695271, at *5 (M.D. Pa. Sept. 28, 2015) (same).

Given the currently nonexistent COVID-19 incidence rate at CI Rivers, the high incidence rate outside the facility, and the success of the institution's medical staff in managing Paz's medical conditions and preventing acute or debilitating consequences of those illnesses, the relative risks weigh against Paz's request for early release.

### C.   This Court Lacks Authority to Direct the BOP to Place the Defendant in Home Confinement.

Finally, were the Court to read Paz's motion as a request to order BOP to place him on home confinement under the guidelines set forth in the Attorney General's March 26 and April 3, 2020 memoranda,[6] the Court should deny the request because this Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

---

[6] Memoranda available at: https://www.bop.gov/coronavirus/faq.jsp.

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *See United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Thus, as any request by Paz for home confinement would alter only the place and not the term of incarceration, only BOP may grant or deny such a request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("[T]he Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). And, after it imposes a sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *See United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam). Section 3582(c) contemplates only a reduction in sentence, which would not result from Paz's mere transfer from one location of incarceration (CI Rivers) to another (his residence). An order

16

directing the BOP to transfer Paz to home confinement therefore would fall outside § 3582(c)'s limited grant of authority. Absent any other statutory authority—and Paz cites none—this Court has cannot grant such relief in this forum.

## IV.    CONCLUSION

For the reasons set forth above, this Court should deny Paz's motion for a sentence reduction, with prejudice.

Respectfully submitted,

CRAIG CARPENITO
United States Attorney
970 Broad Street, Room 700
Newark, New Jersey 07102
(973) 645-2742

By:    Sarah A. Sulkowski
Assistant U.S. Attorney

Dated:     May 22, 2020